UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SHAKIM ABD ALLAH,

                              Plaintiff,

        v.

ANTHONY ANNUCCI; CHERYL
MORRIS; THOMAS GRIFFIN; JAIFA
COLLADO,

                              Defendants.

No. 16-CV-1841 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances</u>:

Shakim A. Allah
Comstock, NY
*Pro Se Plaintiff*

Brendan M. Horan, Esq.
New York State Office of the Attorney General
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Plaintiff Shakim Abd Allah ("Plaintiff"), currently an inmate at Great Meadow

Correctional Facility ("Great Meadow"), brings this pro se Action against Anthony Annucci

("Annucci"), Commissioner of the New York State Department of Corrections and Community

Supervision ("DOCCS"); Cheryl Morris ("Morris"), DOCCS Director of Family and Ministerial

Services; Thomas Griffin ("Griffin"), Superintendent of the Green Haven Correctional Facility

("Green Haven"); and Jaifa Collado ("Collado"), Deputy Superintendent of Program Services at

Green Haven (collectively, the "initial Defendants"), alleging that they violated his rights under

the First and Fourteenth Amendments and New York State law by denying Plaintiff the

opportunity to attend certain religious events and by failing to provide certain religious

accommodations while he was incarcerated at Green Haven.  (*See* Am. Compl. (Dkt. No. 44).)

By Opinion & Order dated September 24, 2018, the Court dismissed all claims against Annucci

and Morris, and some claims against Griffin and Collado ("Defendants").  (*See* Dkt. No. 54.)

Currently before the Court is Defendants' Motion for Summary Judgment (the "Motion").  (*See*

Not. of Mot. (Dkt. No. 90).)  For the reasons that follow, Defendants' Motion is granted.

## I.  Background

### A.  Factual Background

The following facts are taken from the exhibits submitted, (Dkt. Nos. 93–95), and

Defendants' Statement pursuant to Local Civil Rule 56.1, (Defs.' Rule 56.1 Statement in Supp. of

Motion ("Defs.' 56.1") (Dkt. No. 97)).[1]  These facts are recounted "in the light most favorable

---

[1] Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  Local Civ. R. 56.1(a).  The nonmoving party, in turn, must submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  Local Civ. R. 56.1(b).  "A pro se litigant is not excused from this rule," *Brandever v. Port Imperial Ferry Corp.,* No. 13-CV-2813, 2014 WL 1053774, at *3 (S.D.N.Y. Mar. 13, 2014) (citation and italics omitted), and "[a] nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible," *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009); *see also Biberaj v. Pritchard Indus., Inc.*, 859 F. Supp. 2d 549, 553 n.3 (S.D.N.Y. 2012) (same).  Here, Defendants filed and served their Statement pursuant to Rule 56.1, (*see* Dkt. Nos. 97, 102), and filed and served a Statement notifying Plaintiff of the potential consequences of not responding to the Motion, as required by Local Rule 56.2, (*see* Dkt. Nos. 90-1, 96).  Despite this notice, Plaintiff failed to submit a response to Defendant's 56.1 Statement.  Accordingly, the Court may conclude that the facts in Defendants' 56.1 Statement are uncontested and admissible.  *See Brandever,* 2014 WL 1053774, at *3 (concluding that because the pro se plaintiff did not submit a Rule 56.1 statement in response to the defendant's statement of facts, "there [were] no material issues of fact"); *Anand v. N.Y. State Div. of Hous. & Cmty. Renewal,* No. 11-CV-9616, 2013 WL 4757837, at *7 (S.D.N.Y. Aug. 29, 2013) (same).

Nevertheless, in light of the "special solicitude" afforded to pro se litigants "when confronted with motions for summary judgment," *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988), the Court will "in its discretion opt to conduct an assiduous review of the record," including Plaintiff's deposition testimony, when deciding the instant Motion.  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and quotation marks omitted); *see also Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 502 n.1 (S.D.N.Y. 2015) (considering "the

to" Plaintiff, the non-movant. *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018)

(citation and quotation marks omitted).  The facts as described below are not in dispute, except to

the extent indicated.

### 1.  Plaintiff's Religious Practice

Plaintiff entered the custody of DOCCS in 1977, and has remained incarcerated ever

since.  (Defs.' 56.1 ¶¶ 1–2.)  In 1981 or 1982, Plaintiff discovered Islam and converted, and he

has been registered with DOCCS as a Shi'ite Muslim since approximately 2010.  (*Id.* ¶¶ 4–6.)

As is clear from his deposition testimony, Plaintiff is a devout Shi'ite Muslim who has diligently

observed his faith for decades, often at considerable personal sacrifice.  (*See* Decl. of Brendan

M. Horan, Esq. in Supp. of Mot. ("Horan Decl.") Ex. B ("Pl.'s Dep.") 212–13 (Dkt. No. 92-2).)

When Plaintiff first arrived at Green Haven in March 2014, there were between 500 and

600 other Muslim inmates, of whom approximately 200 regularly attended religious services.

(Defs.' 56.1 ¶¶ 23–24.)  In October 2015, there were over 1,950 total inmates at Green Haven, of

whom approximately 249 had registered "Islam" as their religion and 14 identified as Shi'ite.

---

statements and documents in [p]laintiff's opposition papers to determine if there are any material
issues of fact based on the evidence in the record," but disregarding factual assertions that "do
not contain citations to the record, or are not supported by the citations in the record"); *Houston
v. Teamsters Local 210, Affiliated Health & Ins. Fund-Vacation Fringe Benefit Fund*, 27 F. Supp.
3d 346, 349 (E.D.N.Y. 2014) ("Although plaintiffs did not file a Rule 56.1 statement, the Court
has independently reviewed the record to ensure that there is uncontroverted evidence to support
the paragraphs referenced in defendants' Rule 56.1."); *Pagan v. Corr. Med. Servs.,* No. 11-CV-
1357, 2013 WL 5425587, at *2 (S.D.N.Y. Sept. 27, 2013) (explaining that "[t]he [c]ourt ha[d]
considered the [motions for summary judgment] in light of the entirety of the record to afford
[the pro se] [p]laintiff the special solicitude to which he [was] entitled" where the plaintiff failed
to submit a Rule 56.1 response); *Cherry v. Byram Hills Cent. Sch. Dist.*, No. 11-CV-3872, 2013
WL 2922483, at *1 (S.D.N.Y. June 14, 2013) (italics omitted) ("[W]here a pro se plaintiff fails to
submit a proper . . . Rule 56.1 statement in opposition to a summary judgment motion, the [c]ourt
retains some discretion to consider the substance of the plaintiff's arguments, where actually
supported by evidentiary submissions." (citation and italics omitted)).

(*Id.* ¶¶ 54–57.)  When Plaintiff left Green Haven in 2017, there were approximately 15 to 18 Shi'ite inmates, and the rest of the Muslim inmates were Sunni.  (*Id.* ¶¶ 26–27.)

During the relevant period, Green Haven offered a single weekly religious service for all Muslims, provided Muslim inmates with a single fundraising account (which was nominally for the benefit of all Muslims) and hosted weekly religious classes for all Muslims, without distinction by sect.  (*Id.* ¶¶ 28–32.)  At that time, DOCCS' central Division of Ministerial, Family, and Volunteer Services Central Office generally advised facilities to offer a single Jummah service "to the general Muslim community, regardless of sect."  (*Id.* ¶ 83.)  This advice was "based on consultation with inmates, prison administrators, and the outside religious community."  (*Id.*)  Additionally, Green Haven hosted "family days" or other events on certain holidays holy to both Sunnis and Shi'ites, particularly Eid-ul-Fitr, Eid al-Adha, and the six days of Shawwal.  (*Id.* ¶¶ 33–34.)  Green Haven also held specific religious events for Shi'ite inmates for the holidays of Ghadir Khum, Mubahilah, and the 10 Days of Ashura.  (*Id.* ¶ 51.)

During the relevant time period, Green Haven employed a single Muslim chaplain, Abdullah Wajid ("Wajid"), a Sunni; however, Plaintiff acknowledges that Wajid was "good chaplain" to all Muslim inmates.  (*Id.* ¶¶ 36–40; Pl.'s Dep. 184.)  DOCCS also employed a Shi'ite chaplain available to all inmates statewide.  (*See* Decl. of Muhammed S. Ahmed in Supp. of Mot. ("Ahmed Decl.") ¶ 35 (Dkt. No. 95).)  Additionally, when a volunteer Shi'ite chaplain visited the facility, he was permitted to lead prayer services, as were individual Green Haven Shi'ite inmates.  (Defs.' 56.1 ¶¶ 41–44.)  Plaintiff also attended Shi'ite classes on Thursday evenings, facilitated by a fellow Shi'ite inmate Jamal Jones.  (*Id.* ¶¶ 45–49; Pl.'s Dep. 156.)

Although in the early years after his conversion, Plaintiff had no objection to joining a prayer service led by a Sunni Muslim, as Plaintiff learned more about his religion, he developed

the religious view that his prayer services must be led by a Shi'ite Muslim.  (Defs.' 56.1 ¶¶ 21–22.)  Moreover, Plaintiff attests that in the late 1990s, with the arrival of new chaplains from Saudi Arabia, tensions between Sunni and Shi'ite inmates increased and Sunni inmates began to insist that everyone pray according to Sunni custom.  (Pl.'s Dep. 61–62, 160–62.)  Accordingly, from at least 2005, Plaintiff would not pray with the Sunni community.  (*Id.* at 179–82.)

Although Green Haven organized and supported a fundraiser for the Muslim community generally, Plaintiff attests that in practice the fundraiser benefitted only the Sunni community, and explains that it "was controlled and dominated by Sunni Muslims."  (*Id.* at 218–20.)  Plaintiff explains that he did not request funds from this fundraiser for the Shi'ite community because of tension between the Shi'ites and Sunnis at Green Haven.  (*Id.* at 228.)  However, Plaintiff acknowledges that he was able to obtain several hundred dollars for Shi'ite books by requesting the funds from Wajid who received the money from a DOCCS fund (separate from the Sunni fundraiser).  (*Id.* at 221.)  Plaintiff also attests that he once unsuccessfully requested an opportunity to conduct fundraising for the Shi'ite community, but that he made that request before Collado and Griffin joined the Green Haven staff.  (*Id.* at 226.)

## 2.  Denial of Attendance at Holy Day Events

During the relevant period, Green Haven regulated inmate attendance at religious events through a "call out system."  (Defs.' 56.1 ¶ 102)  Under that system, when inmates requested to attend an event for their religious holidays, their names were added to a relevant "event package," which was distributed throughout the facility, including to the watch commander and housing areas, in advance of the event.  (*Id.* ¶ 103.)  If an inmate's name appeared in the package, housing unit officers would then send the inmate to the appropriate area of facility at the relevant time.  (*Id.* ¶ 104.)

In years prior to 2015, Plaintiff's name had appeared in the relevant packages for the holidays of Mubahila, Ghadir Khum, and the Days of Ashura, and so he was able to attend services.  (*Id.* ¶¶ 106, 111.)  Plaintiff believed his name was on the list for these holidays in October 2015 as well, and he further understood that inmates registered as Shi'ite Muslims were automatically placed on the "call out list" for these holidays.  (*Id.* ¶¶ 110–12.)  In fact, Plaintiff was listed as a participating inmate in the event package for these holidays in October 2015, and the packages were signed by Collado.  (*Id.* ¶ 113.)

However, on October 2, 2015, the day of Ghadir Khum, when Plaintiff informed the housing officer on duty that he had a religious event that evening, the officer explained that he had no record of such an event.  (Pl.'s Dep. 248.)  Plaintiff was thus not permitted to attend services for Ghadir Khum.  (*Id.*; Defs.'s 56.1 ¶ 109).  That evening, Plaintiff spoke with Wajid and explained what had happened.  (Pl.'s Dep. 248.)  Wajid expressed surprise and claimed that he had personally delivered the relevant "event package" to Plaintiff's block.  (*Id.*)

A similar series of events unfolded on October 8, 2015, again precluding Plaintiff's attendance at services for Mubahila.  (*Id.*)  That afternoon, Plaintiff explained to the housing officer that he had a religious event and insisted that his name appeared in an event package.  (*Id.*)  Again, the officer denied that his housing block had received such a package.  (*Id.* at 249.)  Afterward, Wajid again insisted that he had, in fact, delivered the package to Plaintiff's block the previous evening.  (*Id.*)  Plaintiff then notified Collado, by letter dated October 9, 2015, that he was missing holy day services.  (Defs.' 56.1 ¶¶ 116–17.)  In the letter, Plaintiff explained that he had been denied the opportunity to attend two religious holidays and that on each occasion, he was "informed by the officer taking the go around that there was no event package or callout in A

[Block] stating that there were any Shi'ite events." (*Id.* ¶ 118; Decl. of Superintendent Jaifa

Collado ("Collado Decl.") Ex. H ("Plaintiff's 10/9/2015 Letter") (Dkt. No. 93-8).)

Collado received the letter on October 14, 2015.  (Defs.' 56.1 ¶ 122.)  Prior to receiving

Plaintiff's letter, Collado was not aware that Plaintiff had been denied attendance at any religious

event.  (*Id.* ¶ 124.)  The same day, Collado corresponded with Wajid about the letter, and Wajid

assured Collado that he would personally bring event packages for the Shi'ite holidays to

Housing Block A and Housing Block B because he had been informed that they did not have

copies of the package.  (*Id.* ¶ 125; Collado Decl. Ex. I ("Collado Emails") 3–4 (Dkt. No. 93-9).)

According to Collado, additional copies of the event package were also sent to A Block (where

Plaintiff was located) by inmate runners, by email from Collado's assistant, and by email from

Assistant Deputy Superintendent for Program Services David Howard ("Howard").  (*Id.* ¶ 126.)

Collado believed that these transmissions would ensure that the housing officer would allow

Plaintiff to attend future Shi'ite religious events later that month.  (*Id.* ¶ 127.)  From October 16,

2015 through October 25, 2015, Collado was away from Green Haven on vacation.  (*Id.* ¶ 128.)

While Collado was away, her responsibilities were covered by other prison officials, including

Howard.  (*Id.* ¶ 129.)  According to Collado, she had no reason to believe that Howard was

incapable of adequately handling Collado's responsibilities during his vacation.  (*Id.* ¶ 130.)

In 2015, the Days of Ashura began on October 15.  (*Id.* ¶ 131.)  Again, Plaintiff was told

by housing officers that there was no event package regarding the holiday in his block, and thus

Plaintiff was again unable to attend services.  (Pl.'s Dep. 262–63.)  On October 16, 2015,

Howard sent an email to the watch commander, with a copy to Collado, clarifying that Plaintiff

was allowed to participate in the Days of Ashura event and requesting that the watch commander

ensure that Plaintiff be permitted attend the event.  (*Id.* ¶ 132; Collado Decl. Ex. J ("Howard

Emails") (Dkt. No. 93-10).)  On October 19, 2015, Howard sent another email to the watch

commander, again copying Collado, reiterating that Plaintiff was allowed to participate in the

Days of Ashura event and requesting that he ensure that Plaintiff attend the event.  (Defs. 56.1  ¶

133; Howard Emails.)  Additionally, despite being away, on the morning of October 19, 2015,

Collado sent a follow-up email to Wajid directing that he "make sure that [Plaintiff] is allowed to

participate [in the Days of Ashura observances]."  (Collado Emails 1.)  Several hours later, Wajid

responded, explaining that he and Howard were handling the situation, and stating, "[p]lease try

to enjoy your time off, we'll take care of things here."  (*Id.*; Defs.' 56.1 ¶¶ 134–35)

Nevertheless, for the entire holiday period through October 24, 2015, the same pattern

recurred; the officers on duty at Plaintiff's housing block explained that they had no event

package, and Plaintiff was unable to attend services.  (Pl.'s Dep. 263.)

On November 12, 2015, after Collado returned from vacation, she responded to

Plaintiff's letter.  (Defs.' 56.1 ¶ 136.)  Collado explained to Plaintiff that she had been out on

vacation but instructed others to take care of the issue, and that she would now find out what had

happened.  (*Id.* ¶ 138.)  During a subsequent investigation of the episode by Green Haven

sergeants, one of the sergeants informed Plaintiff that Plaintiff was precluded from attending

services because he was "under some type of disciplinary sanction."  (Pl.'s Dep. 263.)  Plaintiff

denies this, however, explaining he "[n]ever got one ticket the whole time [he] was there."  (*Id.*)

### 3.  Plaintiff Files a Grievance

On October 23, 2015, Plaintiff filed a grievance in which he claimed that DOCCS had

denied him "the right to have Jumah Services, religious holidays, a Shi'ite chaplain, equal

number of weekly religious classes, fundraiser, as well as [an] Inmate Shi'ite clerk," and that

DOCCS was providing all of the same "to members of other faith groups."  (Collado Decl. Ex. C

8

("Plaintiff's Grievance") 3 (Dkt. No. 93-3); Defs.' 56.1 ¶ 54.)  On November 23, 2015, Collado

recommended that Plaintiff's Grievance be denied in full.  (Collado Decl. Ex. F ("Collado

Grievance Recommendation") (Dkt. No. 93-6).)  In particular, Collado explained that Shi'ite

inmates "participate in Jumah services with the Muslim community"; that Shi'ite holidays,

including "Day of Ghadir, Mubahilah and the 10 days of Ashura, are recognized in the religious

Holy Day Calendar"; that Shi'ite religious needs "are being met by the Muslim Chaplain"; that

Shi'ite inmates attend classes for the general Muslim community on Tuesdays and Wednesdays

and "also have separate classes on Thursday evenings"; that in her 12 months at Green Haven,

she had "never received a request for fundraising from the Shi'ite population"; and that there was

no need to hire a paid Shi'ite clerk, because a volunteer Shi'ite clerk was fully meeting the office

needs of the relatively small, 14-member Shi'ite community.  (*Id.*)  On February 10, 2016,

Griffin accepted Collado's recommendation and denied Plaintiff's grievance for substantially the

same reasons.  (*See* Decl. of Assistant Commissioner Thomas Griffin ("Griffin Decl.") Ex. A.

("Grievance Denial") (Dkt. No. 94-1).)  Aside from Plaintiff's grievance, Defendants received no

formal request from the Shi'ite community to establish a fundraising organization.  (Defs.' 56.1

¶¶ 69–70.)  Defendants also never received any other request for separate weekly congregate

services specifically for the Shi'ite community, nor for any of the other services requested by

Plaintiff.  (*Id.* ¶ 73.)

###### B.  Procedural History

Plaintiff filed his initial Complaint on March 11, 2016.  (*See* Dkt. No. 2.)  Plaintiff's

request to proceed in forma pauperis was granted on March 16, 2016.  (*See* Dkt. No. 4.)  On

September 2, 2016, the initial Defendants filed their first Motion To Dismiss (the "First Motion")

and accompanying papers.  (*See* Dkt. Nos. 23–26.)  On October 3, 2016, Plaintiff filed his

Opposition.  (*See* Dkt. Nos. 28–30.)  The initial Defendants filed their Reply on October 21, 2016.  (*See* Dkt. No. 33.)  On September 7, 2017, the Court issued an Opinion and Order dismissing all of Plaintiff's claims against Annucci and Griffin, but denying that First Motion as to Plaintiff's claims against Morris and Collado regarding the denial of Plaintiff's attendance at Ghadir Khum and Mubahila events.  (*See* Op. & Order on Mot. to Dismiss ("2017 Opinion") 23 (Dkt. No. 41).)  In light of Plaintiff's pro se status, and because it was the first adjudication of Plaintiff's claims on the merits, the dismissal was without prejudice, and Plaintiff was given thirty days to file an amended complaint.  (*See id.*)

On October 2, 2017, Plaintiff's Amended Complaint was docketed.  (*See* Am. Compl.) Pursuant to a briefing schedule issued on November 14, 2017, (*see* Dkt. No. 46), the initial Defendants filed a second Motion To Dismiss (the "Second Motion") on December 14, 2017, (*see* Dkt. Nos. 47–48).  On September 24, 2018, the Court issued an Opinion and Order dismissing all state law claims, all claims for declaratory and injunctive relief, all claims against Annucci and Morris, and claims against Griffin with respect to the denial of the attendance at Ghadir Khum and Mubahila events.  (*See* Op. & Order on Mot. to Dismiss the Am. Compl. ("2018 Opinion") 23–24 (Dkt. No. 54).)[2]  Accordingly, Plaintiff's only remaining claims are

---

[2] Plaintiff was transferred from Green Haven to Great Meadow after the Complaint was filed.  (*See* Dkt. Nos. 37, 38 (notifying the Court of Plaintiff's change of address)).  Accordingly, in its 2018 Opinion, the Court concluded that all claims for declaratory and injunctive relief were moot.  *See Prins v. Coughlin*, 76 F.3d 504, 506 (2d Cir. 1996) ("It is settled in th[e] [Second] Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility."); *see also Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) ("[A]n inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility.") (citation omitted); *Lipscomb v. Hufford*, No. 14-CIV-6562, 2017 WL 3267732, at *4 (S.D.N.Y. July 28, 2017) (collecting cases).  Moreover, Plaintiff acknowledges that at his new location, he and the Shi'ite inmates now have their own services separate from the Sunni community, and that he participates in these services.  (*See* Pl.'s Dep. 97–99, 134–35.)  Plaintiff also acknowledges that since February 2019, the Shi'ite community is

against Griffin and Collado for failure to provide equal religious accommodations, and against Collado for denial of attendance at holiday events.  (*Id.*)

On September 27, 2019, Defendants filed the instant Motion and accompanying papers. (*See* Not. of Mot.; Defs.' Mem. of Law in Supp. of Mot. ("Defs.' Mem.") (Dkt. No. 91); Horan Decl.; Collado Decl.; Ahmed Decl.; Defs.' 56.1.)  On October 15, 2019, Plaintiff wrote to the Court requesting that the Motion be denied for failure to comply with Local Rule 56.2.  (*See* Dkt. Nos. 98-1; 100.)  On October 18, 2019, Defendants responded to Plaintiff's letter, noting that they had in fact complied with Local Rule 56.2, and attaching proof of service.  (*See* Dkt. No. 98.)  On October 22, 2019, the Court directed Plaintiff to respond to Defendants' Motion within 30 days.  (Dkt. No. 99.)  On December 12, 2019, Defendants wrote to the Court, noting that Plaintiff had never filed an opposition to the instant Motion.  (Dkt. No. 103.)  Four days later, the Court issued an Order deeming the Motion fully submitted.  (Dkt. No. 104.)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted); *see also Borough of Upper Saddle River*

---

now able to promote their own separate fundraiser, has "separate everything," and that he is "very happy" with the current arrangements.  (*Id.* at 171)

*v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry*, 137 F. Supp. 3d at 521 (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'"  *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").  And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted).  At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (quotation marks omitted).  Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).  However, a district court should consider only evidence that would be admissible at trial.  *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998).  "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'"  *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

Finally, the Second Circuit has instructed that when a court considers a motion for summary judgment, "special solicitude" should be afforded a pro se litigant, *see Graham,* 848 F.2d at 344; *Mercado v. Div. of N.Y. State Police,* No. 96-CV-235, 2001 WL 563741, at *7 (S.D.N.Y. May 24, 2001) (same), and a court should construe "the submissions of a pro se litigant . . . liberally" and interpret them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (italics and quotation marks omitted).  And, "the failure to oppose a motion for summary judgment alone does not justify the granting of summary judgment." *Vt. Teddy Bear Co.*, 373 F.3d at 244; *see also Jackson v. Fed. Express.*, 766 F.3d 189, 196 (2d Cir. 2014) (explaining that "an examination of the legal validity of an entry of summary judgment should . . . be[] made in light of the opposing

13

party's pro se status" (italics omitted)).  Nonetheless, "proceeding pro se does not otherwise

relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald

assertions unsupported by evidence . . . are insufficient to overcome a motion for summary

judgment."  *Houston*, 27 F. Supp. 3d at 351 (quotation marks omitted); *see also Flores v. City of*

*New York*, No. 15-CV-2903, 2017 WL 3263147, at *2 (S.D.N.Y. July 31, 2017) (same).

     B.  Analysis

     Defendants argue that Plaintiff's remaining claims (all of which seek damages, rather

than injunctive or declaratory relief) fail because the undisputed evidence establishes: that

Collado was not personally involved in denying Plaintiff the opportunity to attend religious

services; that the religious accommodations provided to Shi'ite Muslims at Green Haven were

reasonable in light of the facility's legitimate penological interests; that there is no similarly

situated religious group that received greater religious accommodations at Green Haven; and that

Defendants are entitled to qualified immunity.  (*See generally* Defs.' Mem.)  The Court

addresses these arguments only to the extent necessary to decide the instant Motion.  In doing so,

the Court first considers Plaintiff's claim that Collado violated Plaintiff's constitutional rights by

denying him the opportunity to attend several religious services during October 2015.  The Court

then considers Plaintiff's claim that Collado and Griffin violated Plaintiff's constitutional rights

by denying additional religious accommodations.

     1.  Denial of the Opportunity to Attend Holiday Services

     "It is well settled that, in order to establish a defendant's individual liability in a suit

brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the

alleged constitutional deprivation."  *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir.

2013).  To establish personal involvement, a plaintiff must show that:

> (1) the defendant participated directly in the alleged constitutional violation[;] (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong[;] (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom[;] (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts[;] or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 139 (alterations and italics omitted) (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). "In an action under 42 U.S.C. § 1983, defendants cannot be held liable under a theory of respondeat superior," *Quezada v. Roy*, No. 14-CV-4056, 2015 WL 5547277, at *7 (S.D.N.Y. Sept. 18, 2015) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)); in other words, "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the [law]," *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Thus, a plaintiff must establish that a defendant's own conduct falls into one of the five categories identified above. *See Lebron v. Mrzyglod*, No. 14-CV-10290, 2017 WL 365493, at *4 (S.D.N.Y. Jan. 24, 2017) (holding that the five categories "still control[] with respect to claims that do not require a showing of discriminatory intent" post-*Iqbal*).

Here, Plaintiff has produced no evidence establishing Collado's personal involvement in denying Plaintiff access to holiday services. On the contrary, the undisputed evidence suggests that to the extent Collado was aware of Plaintiff's situation, she acted to ensure his attendance. Collado first learned of Plaintiff's difficulties attending religious events by letter from Plaintiff (dated October 9, 2015) on October 14, 2015. (Defs.' 56.1 ¶¶ 116–24.) The same day, Collado wrote to Wajid seeking to ensure that Plaintiff would be able to attend services for the Days of Ashura, and Wajid informed her that he would personally deliver the relevant event package to Plaintiff's housing unit. (*Id.* ¶ 125.) Moreover, under Collado's direction, additional copies of

the event package were also delivered by inmate runners and by email.  (*Id.* ¶ 126.)  Because

Collado promptly acted on Plaintiff's letter and referred the matter to an appropriate official, she

cannot be held personally liable for the failure to ensure Plaintiff's attendance.  *See Brown v.*

*Griffin*, No. 18-CV-5439, 2019 WL 4688641, at *7 (S.D.N.Y. Sept. 25, 2019) ("[A] supervisory

official is not deemed to have been personally involved in a constitutional violation solely by

virtue of having received a letter from a prisoner and having referred it to the appropriate

department for investigation." (citation, quotation marks and ellipses omitted)); *Philip v. Schriro*,

No. 12-CV-8349, 2014 WL 4184816, at *5 (S.D.N.Y. Aug. 22, 2014) (collecting cases); *see also*

*Rivera v. Fischer*, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009) ("The general rule is that if an

official receives a letter from an inmate and passes it on to a subordinate for response or

investigation, the official will not be deemed personally involved with respect to the subject

matter of the letter." (citing *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997))).

      Moreover, after October 14, 2015 and for the duration of the Days of Ahura, Collado was

away from Green Haven, believing that other prison officials, including Howard and Wajid,

would ensure that Plaintiff would be able to attend future services.  (*Id.* ¶ 127–33.)  Collado

cannot be held liable for Howard's and Wajid's failures because it is well-established that

"vicarious liability is inapplicable to . . . § 1983 suits."  *Iqbal*, 556 U.S. at 676; *see also Rivera v.*

*Westchester County*, No. 18-CV-8354, 2019 WL 3958425, at *3 (S.D.N.Y. Aug. 22, 2019)

("Where a defendant is a supervisory official, a mere 'linkage' to the unlawful conduct through

the 'chain of command' (i.e., under the doctrine of respondeat superior) is insufficient to show

his or her personal involvement in that unlawful conduct." (citation and quotation marks

omitted)).  Relatedly, according to Plaintiff himself, the "only explanation" for the missing event

packages is that they were discarded by an unknown housing officer during the midnight shift.

(Pl.'s Dep. 265–66).  Plaintiff does not allege that Collado had any authority over or relationship with this individual, but even if she did have such authority, again, such a supervisory relationship cannot establish Collado's own liability.  *See Iqbal*, 556 U.S. at 676 (rejecting vicarious liability in § 1983 cases); *Rivera*, 2019 WL 3958425, at *3 (same).

While Plaintiff's frustration with the inexplicable failure to ensure his access to religious services in October 2015 is understandable, the record does not establish Collado's personal involvement in a constitutional violation.  Accordingly, the Court grants summary judgment to Collado with respect to this claim.  *See Fernandez v. City of New York*, No. 17-CV- 789, 2020 WL 2086191, at *19 (S.D.N.Y. Apr. 30, 2020) (granting summary judgment to a § 1983 defendant where the record did not establish his personal involvement).

### 2.  Denial of Requested Religious Accommodations

#### a.  Equal Protection Claims

To demonstrate an equal protection claim based on religion, a plaintiff must establish that "he was treated differently from similarly situated members of other religions."  *Jackson v. Mann*, 196 F.3d 316, 321 (2d Cir. 1999).  When pursuing such claims based on the allegedly discriminatory policies of a prison, plaintiffs generally advance such claims under a theory of "selective treatment."  *Barry v. LaManna*, No. 19 CV 4189, 2019 WL 6790515, at *4 (S.D.N.Y. Dec. 12, 2019) ("To state a claim under the Equal Protection Clause, a plaintiff must plausibly allege [that] compared with others similarly situated, he was selectively treated; and that such selective treatment was based on impermissible considerations such as . . . religion") (quotation marks and alterations omitted) (citing *LeClair v. Saunders*, 627 F.2d 606, 609–10 (2d Cir. 1980)); *Brown*, 2019 WL 4688641, at *5 (analyzing a claim for unequal prison treatment on the basis of religion under the Equal Protection clause).  Under such a theory, a claimant must show

both (1) that "he, compared with others similarly situated, was selectively treated," and (2) that "the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, or to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the plaintiff." *Vaher v. Town of Orangetown*, 916 F. Supp. 2d 404, 433 (S.D.N.Y. 2013) (citation, quotation marks, and alterations omitted) (quoting *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995)). Although "there is some disagreement within the Second Circuit regarding the degree of similarity necessary to adequately allege an equal protection claim under this theory," with "some courts evaluat[ing] whether a comparator is similarly situated under the same standard used in 'class of one' equal protection claims" and other courts "apply[ing] a less demanding standard to selective enforcement claims," *Panzella v. City of Newburgh*, 231 F. Supp. 3d 1, 7 (S.D.N.Y. 2017) (citations omitted) (collecting cases), *aff'd*, 705 F. App'x 50 (2d Cir. 2017), "it is clear that, at a minimum, some showing of comparison with others similarly situated is required." *Brown*, 2019 WL 4688641, at *5; *see also Carnell v. Myers*, No. 17-CV-7693, 2019 WL 1171489, at *9 (S.D.N.Y. Mar. 13, 2019) (same).

Here, although the Amended Complaint asserted that numerous religious groups received religious benefits that the Shi'ite prisoner community was denied, Plaintiff has failed to establish that any of these groups was "similarly situated." As the Supreme Court has explained, although "reasonable opportunities must be afforded to all prisoners to exercise [ ] religious freedom," not "every religious sect or group within a prison—however few in number—must have identical facilities or personnel." *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972). Thus, it is well established that "[t]he number of inmates adhering to a particular religious group and whether that group requires distinct accommodations are material traits in assessing whether inmates are similarly

situated under DOCCS' registration policy." *Jones v. Annucci*, No. 16-CV-3516, 2018 WL 910594, at *17 (S.D.N.Y. Feb. 14, 2018); *see also Graham v. Mahmood*, No. 05-CV-10071, 2008 WL 1849167, at *14 (S.D.N.Y. Apr. 22, 2008) (explaining that groups of 39 Nation of Islam adherents and 119 Sunni Muslim inmates were "not similarly situated" because "the two groups have different needs for access to meeting spaces and time slots"). Here, the undisputed evidence establishes that only 14 Green Haven inmates identified as Shi'ite in October of 2015—compared to over 200 Sunni inmates at the same time. (Defs.' 56.1 ¶¶ 54–57.) Moreover, Plaintiff acknowledges that he does not know of any other smaller religious group that had separate services or chaplains during that period. (*See* Pl.'s Dep. 246.) No other evidence in the record suggests that the Shi'ite community was similarly situated to the other religious groups. Accordingly, Plaintiff's claims under the Equal Protection Clause fail. *See Brown*, 2019 WL 4688641, at *5 (dismissing equal protection claims of Wiccan inmates because the proposed comparator religious groups had at least ten times as many adherents); *Graham*, 2008 WL 1849167, at *15 (granting summary judgment to defendants with respect to a prisoner's equal protection claim based, in part, on the relative sizes of the compared religious communities).

### b.  Free Exercise Claims

It is well-established that the First Amendment affords inmates constitutional protection to practice their religion. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (holding that "[i]nmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion" (citations omitted)); *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir. 2003) (explaining that "[p]risoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause" (citation omitted)). However, because of inmates' unique

circumstances, their Free Exercise rights are necessarily more constrained than those of other persons. *See Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990) ("Balanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, are the interests of prison officials charged with complex duties arising from administration of the penal system." (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974))). Accordingly, "a generally applicable policy will not be held to violate a plaintiff's right to free exercise of religion if that policy is reasonably related to legitimate penological interests." *Redd v. Wright*, 597 F.3d 532, 536 (citation and quotation marks omitted).[3]

A prisoner's free exercise claims are therefore "judged under a 'reasonableness' test less restrictive than ordinarily applied to alleged infringements of fundamental constitutional rights." *Ford*, 352 F.3d at 588 (citation and some quotation marks omitted). To state a free exercise claim, an inmate "must make a threshold showing that 'the disputed conduct substantially burdened his sincerely held religious beliefs.'" *Washington v. Chaboty*, No. 09-CV-9199, 2015 WL 1439348, at *9 (S.D.N.Y. Mar. 30, 2015) (alterations omitted) (quoting *Washington v. Gonyea*, 538 F. App'x 23, 26 (2d Cir. 2013)); *see also Salahuddin v. Goord*, 467 F.3d 263, 274–75 (2d Cir. 2006) (same). To show a belief is "sincere," the inmate "need only demonstrate that

---

[3] In one respect, inmates may receive greater constitutional protection of their religious freedom than non-prisoners. While non-prisoners "enjoy no constitutional right to religious accommodations from generally applicable laws," prisoners may "demand a religious accommodation where facilitating exercise of the right has only a de minimis adverse effect on valid penological interests." *Rutherford v. Westchester County*, No. 18-CV-4872, 2020 WL 433841, at *6 n.6 (S.D.N.Y. Jan. 28, 2020) (quotation marks omitted) (citing *Employment Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 890 (1990) and *Holland v. Goord*, 758 F.3d 215, 222 (2d Cir. 2014)). However, "[w]hile is well-established that inmates possess such a qualified right to religious accommodations, it is unclear whether the First Amendment independently provides such a right, or whether, in the aftermath of *Smith*, this right exists only in combination with the Religious Land Use and Institutionalized Person Act." *Id.* at *5 n.5 (citing *Ford*, 352 F.3d at 594 n.13).

the beliefs professed are sincerely held and in the individual's own scheme of things, religious."
*Ford*, 352 F.3d at 588 (citations, alterations, and quotation marks omitted).  To show a
"substantial burden," the inmate must show that "the state [has] put[ ] substantial pressure on an
adherent to modify his behavior and to violate his beliefs."  *Rossi v. Fishcer*, No. 13-CV-3167,
2015 WL 769551, at *7 (S.D.N.Y. Feb. 24, 2015) (citations and quotation marks omitted).  That
is, "[t]he relevant question in determining whether [the inmate's] religious beliefs were
substantially burdened is whether participation in the [religious activity], in particular, is
considered central or important to [the inmate's religious] practice."  *Ford*, 352 F.3d at 593–94.
"Once [an inmate] establishes this burden, '[t]he defendants then bear the relatively limited
burden of identifying the legitimate penological interests that justify the impinging conduct.'"
*Smith v. Perlman*, No. 11-CV-20, 2012 WL 929848, at *7 (N.D.N.Y. Mar. 19, 2012) (quoting
*Salahuddin*, 467 F.3d at 308).[4]  The burden then shifts back to the inmate "to show that these
articulated concerns were irrational."  *Salahuddin*, 467 F.3d at 275 (citation, quotation marks,
and alteration omitted).

Crucially, where (as here) a plaintiff advances a Free Exercise claim pursuant to § 1983,
a plaintiff must establish that the defendant (at least) had reason to know "the facts rendering [his
conduct] illegal."  *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (footnote
omitted); *see also Brandon v. Kinter*, 938 F.3d 21, 38 (2d Cir. 2019) (declining to decide
whether some forms of negligence are sufficient for a Free Exercise claim, but explaining that

---

[4] Under RLUIPA, defendants bear the heavier burden of demonstrating that their
challenged conduct was "(1) in furtherance of a *compelling* governmental interest; and (2) the
*least restrictive* means of furthering that compelling governmental interest."  42 U.S.C.
§ 2000cc-l(a) (2000) (emphasis added).  Here, RLUIPA is not implicated because RLUIPA does
not permit suits for damages.  *See Brown*, 2019 WL 4688641, at *6 (citing *Sossamon v. Texas*,
563 U.S. 277, 285–86 (2011) and *Washington v. Gonyea*, 731 F.3d 143, 144 (2d Cir. 2013)).

deliberate indifference is sufficient); *Grullon*, 720 F.3d at 139 (explaining that liability under § 1983 requires, at least, grossly negligent or deliberately indifferent conduct); *Valdez v. City of New York*, No. 11-CV- 05194, 2013 WL 8642169, at *14, *19 (S.D.N.Y. Sept. 3, 2013) (analyzing whether a defendant knew that his conduct was "likely to cause [the p]laintiff to feel pressured to give up his religious practices" and whether another defendant "had any reason to know" that its conduct would pressure religious inmates), *report and recommendation adopted*, 2014 WL 2767201 (S.D.N.Y. June 17, 2014).  Accordingly, insofar as Defendants did not have reason to know that their conduct burdened Plaintiff's religious practice, they cannot be held liable for having done so.  *See Porter v. Bunch*, No. 16-CV-5935, 2019 WL 1428431, at *16 (S.D.N.Y. Mar. 29, 2019) (explaining that the defendant could not be held liable for failing to provide a religious accommodation where that accommodation had not been requested); *Perez v. Westchester Cty. Dep't of Corr.*, No. 05-CV- 8120, 2007 WL 1288579, at *3 (S.D.N.Y. Apr. 30, 2007) (same).  Moreover, under the doctrine of qualified immunity, a government official is immune from liability "whenever (1) his conduct did not violate clearly established law, or (2) it was objectively reasonable . . . to believe that his action did not violate such law."  *Naumovski v. Norris*, 934 F.3d 200, 210 (2d Cir. 2019) (quotation marks and footnote omitted).  For this reason as well, insofar as Defendants' purported violations of Plaintiff's religious freedoms were the products of "reasonable mistakes of law or fact" they are shielded from liability.  *Id.*

Here, the undisputed evidence establishes that neither Griffin nor Collado should have been aware that existent prison policies may have been unconstitutionally burdening Plaintiff's religious freedoms.  First, Plaintiff concedes that the filing of his grievance was the first time that Griffin and Collado became aware of his request for various accommodations.  (*See* Pl.'s Dep. 229.).  Indeed, Plaintiff acknowledges that his grievance was likely Green Haven's first request

for separate Shi'ite services.  (*Id.* at 243.)  And while Plaintiff attests that he had previously requested to conduct fundraising separately from the Sunni community, that request had occurred "before . . . Collado . . . and before even Griffin" arrived at Green Haven.  (Pl.'s Dep. 226.)  Similarly, neither Griffin nor Collado was aware of any prior request from Shi'ite inmates for religious accommodations.  (Griffin Decl. ¶ 30; Collado Decl. ¶ 46.)  Accordingly, prior to the filing of Plaintiff's grievance, Defendants lacked the relevant knowledge and intent to have violated Plaintiff's Free Exercise rights.  *See Porter*, 2019 WL 1428431, at *16 (explaining that a defendant could not liable for failing to provide a religious accommodation where that accommodation had not been requested); *Perez*, 2007 WL 1288579, at *3 (same).

Second, even after Plaintiff filed his grievance, Defendants were still not put on notice that existent policies placed a "substantial burden" on Plaintiff's religious practices.  Although Plaintiff's deposition provides a thoughtful account of why sharing worship services and fundraising accounts with the Sunni community was religiously unacceptable and practically unworkable, (*see, e.g.*, Pl.'s Dep. 217–19), Plaintiff's grievance was devoid of any such detail, (*see* Pl.'s Grievance).  Indeed, Plaintiff's three-sentence grievance did not even state clearly that he wished a Jummah service separate from Sunni inmates, and certainly did not assert that the combined services were creating a burden on his religious practice.  (*See* Pl.'s Grievance.)[5] Moreover, Defendants understood, based on DOCCS guidance, that the accommodations Plaintiff was requesting "were already provided to the general Muslim community without restriction by sect" and "were sufficient to satisfy the religious requirements of the Shia Muslim

---

[5] While the grievance states that "[a]s a Shi'ite Muslim, DOCCS is denying me my right to have Jumah services, religious holidays, etc.," (Pl.'s Grievance), reasonable officials— particularly those aware of Plaintiff's recent ordeal seeking to attend holiday services—would likely understand Plaintiff as complaining of difficulties in attending existent services, rather than as the assertion of a religious requirement for separate Shi'ite services.

23

community." (Collado Decl. ¶¶ 40, 51; Griffin Decl. ¶¶ 31–32; Defs.' 56.1 ¶¶ 83–85.) From

Defendants' perspective, therefore, Plaintiff's request was not only unclear, but also inconsistent

with expert advice. Accordingly, Defendants lacked knowledge—or even reason to have

knowledge—of the factual basis that may have rendered their policies a violation of Plaintiff's

Free Exercise rights. *See Kramer v. Dep't of Correction*, No. 15-CV-00251, 2019 WL 4805152,

at *9 (D. Conn. Sept. 30, 2019) (granting summary judgment to a defendant with respect to a

free exercise claim because there was no evidence suggesting that the defendant knew that his

conduct burdened the plaintiff's religious practices), *appeal docketed*; *see also Provost*, 262 F.3d

146, 155 (explaining that a defendant is only liable under § 1983 where he knows "the facts

rendering [his conduct] illegal").

Finally, Defendants are also entitled to qualified immunity. The Supreme Court has

emphasized that "clearly established law must be 'particularized' to the facts of the case and

must not be defined 'at a high level of generality.'" *Naumovski*, 934 F.3d at 211 (citing *White v.

Pauly*, 137 S. Ct. 548, 552 (2017)). Thus, while it is "well established that prisoners have a

constitutional right to participate in congregate religious services," *Monroe v. New York State

Dep't of Corr. & Cmty. Supervision*, No. 16-CV-2818, 2019 WL 4688665, at *8 (S.D.N.Y. Sept.

25, 2019) (citation omitted), the relevant question is whether that right was implicated in the

particular circumstances of an individual case. Here, such an infringement was not at all clear.

As discussed above, Defendants had good reason to believe Plaintiff's religious needs were

being met, and Plaintiff's three-sentence grievance offered insufficient detail to put them on

notice that he required a separate Shi'ite Jummah service or Shi'ite fundraising account.

Moreover, it is undisputed that accommodating Plaintiff's requests would have carried

administrative burden, necessitated additional staff, and may well have proved unfeasible given

24

the space and security constraints at this maximum-security facility.  (Defs.' 56.1 ¶ 90–95.)  And

as Plaintiff acknowledges, few other prisons at the time provided the accommodations that

Plaintiff was seeking, particularly to a religious community as small as Plaintiff's.  (Pl.'s Dep.

244.)  Accordingly, and "[g]iven the uncertainty of the infringement on free exercise in this case

and the deference shown to prison officials," *Porter*, 2019 WL 1428431, at *17 (citation

omitted), any violation of Plaintiff's Free Exercise rights was not "clearly established."  *See

Gerard v. City of New York*, No. 17-CV-8076, 2019 WL 4194220, at *5 (S.D.N.Y. Sept. 3, 2019)

(granting summary judgment to defendants where a plaintiff's Free Exercise rights were not

"clearly established) (citation omitted); *see also Hall v. Ekpe*, 408 F. App'x 385, 388 n.3 (2d Cir.

2010) (explaining that "although it was clearly established at the time of the alleged violation

that prison officials may not substantially burden the right of free exercise without some

justification," the defendants were still entitled to qualified immunity because "it was not clearly

established that security and financial concerns could not provide that justification for prisoners

who had not demonstrated observance of their professed religion in a manner identified by the

prison chaplain") (citation omitted).  For this reason as well, Defendants are entitled to summary

judgment.

III.  Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted.

The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No.

90), enter judgment for Defendants, mail a copy of this Opinion to Plaintiff, and close the case.

SO ORDERED.

DATED:      June 10, 2020
            White Plains, New York

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE